COMMONWEALTH of Kentucky ex rel.
et al., Appellant,

v.

ASSOCIATED INDUSTRIES OF
KENTUCKY, Appellee.

Court of Appeals of Kentucky.

June 7, 1963.

Rehearing Denied Oct. 11, 1963.

Paul E. Tierney, Melbourne Mills, Jr., Frankfort, Herbert L. Segal, Louisville, for appellant.

Robert T. Caldwell, Ashland, for appellee.

MOREMEN, Judge.

This is an agreed case testing the constitutionality of KRS 341.145 which relates to unemployment compensation. The trial court declared the Act unconstitutional as violative of Sections 180 and 28 of the Kentucky Constitution.

The Act in question (KRS 341.145) as amended in 1952, authorized the Commissioner of Economic Security to enter into reciprocal administrative arrangements with agencies of other states or the federal government for the purpose of broadening the coverage of unemployment compensation. This law was passed to permit the participation of Kentucky in an interstate unemployment plan originated by the federal government. Its basic purpose was to provide unemployment compensation benefits to those persons employed in more than one state. The plan authorizes adding together work periods in different states to determine a base period permitting an unemployed person to qualify for benefits which he otherwise might not do if his employment period was limited to employment in the state where the compensation claim is filed.

Under the plan the laws of the last state where a person was employed shall be applicable with respect to benefit years, base periods, qualifying wages, benefit rates and duration of benefits. The work and wage records of the employee in other states which are parties to the agreement shall be taken into account in the computation of benefits, and such other states are required to reimburse the state paying the claim for their fair share thereof.

KRS 341.145(3) (a) provides in part:

"Reimbursements to another state or the Federal Government, paid from the fund pursuant to this subsection, *shall be deemed to be benefits* for the purposes of this chapter * * *." (Our emphasis.)

The trial court decided that this scheme violated § 180 of the Constitution, particularly in view of Unemployment Compensation Commission v. Savage, 283 Ky. 301, 140 S.W.2d 1073. That section provides in part that: "no tax levied and collected for one purpose shall ever be devoted to another purpose." Admittedly the contributions to the unemployment compensation fund levied upon employers are taxes.

In the Savage case the legislature had authorized the transfer of approximately $1,000,000 from the Unemployment Compensation Fund to the federal government to be administered by it in the payment of claims to railway employees under the Federal Railroad Unemployment Insurance Act. Taking the view that the state was relinquishing all control of this fund (consisting of tax monies) and that it might be used to pay railroad employees in other states, we held this constituted an unlawful diversion of taxes for a purpose foreign to that for which they were originally collected. Conceding the soundness of this decision (which appellants vigorously deny), we do not think the principles invoked in that case are applicable here.

The taxes involved in the present controversy were collected for the payment of unemployment compensation benefits to those who had joined Kentucky's labor force. As plainly appears from KRS 341.-145(3) (a), from which we have quoted above, the legislature has expressly declared that unemployment compensation benefits paid under the reciprocal arrangement plan shall be deemed benefits within the scope of the purpose for which the taxes are collected. Certainly, increasing benefits is not *changing the purpose* of the fund. Consequently § 180 of the Constitution is not violated.

The more difficult question involves the delegation of power by the legislature to other states and the federal government to fix by their laws the various criteria for determining eligibility for, the amounts and the duration of compensation payments. While the judgment and appellee's brief

refer to § 28 of the Kentucky Constitution, perhaps § 29 is more clearly involved.

The question seems to be whether or not the General Assembly may delegate to other states and the federal government the authority to fix by laws and regulations the conditions under which Kentucky taxes may be expended. The legislature has not adopted particular laws and regulations, and the plan obviously contemplates the future changes in such laws and regulations.

We considered this problem (which is not the customary one of delegation of powers to administrative agencies) in Dawson v. Hamilton, Ky., 314 S.W.2d 532. See also Clay v. Dixie Fire Ins. Co., 168 Ky. 315, 181 S.W. 1123 and Seale v. McKennon, 215 Or. 562, 336 P.2d 340.

Through many of the opinions of this court and those of other states and the federal courts runs the theme that legislative power may not be delegated and, so far as we have been able to find, the opinions have devoted little time to determining the origin of this dogma or even the necessity for its existence.

We find nothing in our State Constitution that declares explicitly: "Legislative power may not be delegated." Here are the three sections of the Constitution usually quoted in support of that statement.

"§ 27. The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

"§ 28. No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

"§ 29. The legislative power shall be vested in a House of Representatives and a Senate, which, together, shall be styled the 'General Assembly of the Commonwealth of Kentucky.'"

We can read into § 27 only an intent to divide the sovereign power, which at one time existed in one person under the divine right of a king, into three separate and distinct departments.

Section 28 seems merely to prohibit one department from grabbing power that properly belongs to another, and the simple wording of § 29 sets up the mechanics for the exercise of legislative power in a bicameral assembly.

Section 29 uses the word "vested" and though it is quite generally considered to be a word of art, still the word has no settled meaning which precludes the one in whom the title is vested from permitting others to use it or even divesting title entirely. When one is once vested with the title, say to real estate, he is not forever precluded from allowing others to use that real estate permissively or otherwise dispose of it.

Although we have found nothing in the Constitution that declares legislative power may not be delegated, we do find instances where the legislature is inferentially authorized to delegate its legislative power, such as § 156 of the Constitution where it is said:

" * * * The General Assembly, by a general law, shall provide how towns may be organized, *and enact laws for the government of such towns until the same are assigned to one or the other of the classes* above named; but such assignment shall be made at the first session of the General Assembly after the organization of said town or city." (Our emphasis.)

The Supplement § 166 of the Constitution reads in part:

"All acts of incorporation of cities and towns heretofore granted, and all amendments thereto, except as provided in section 167, shall continue in force under this Constitution, and all City and Police Courts established in any city or town shall remain, with their present powers and jurisdictions, until such time as the General Assembly *shall provide by general laws for the government of towns and cities, and the officers and courts thereof; * * **.*" (Our emphasis.)

It will be noted that neither section specifically affirms the right of the General Assembly to delegate a portion of its legislative power to the governmental body of a municipality. Inferentially it has the right to define the means of government and by statute set up law-making bodies for cities of the various classes and, thereby, delegate a portion of its power.

Even if we assign to the word "vested," as used in § 29, its usual meaning descriptive of a right which is complete and one of which the person to whom it belongs cannot be divested without consent, we find no admonition—here the right is and here it will remain. If the word is one of absolute limitation (a vested right may never be divested, even with the permission of the owner) then what right has the General Assembly to divest itself of this vested legislative power?

So, we repeat, the genesis of the phrase "legislative power may not be delegated" is not in the Constitution itself. That document indicates that it should be delegated in certain cases.

A research of many of the decided cases in this country discloses that this proposition is of rather obscure origin. Most often quoted, as authority, is Judge Cooley's statement that:

"One of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the State has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed."

This passage was cited by this Court with approval as late as the year 1958. See Dawson v. Hamilton, Ky., 314 S.W.2d 532.

In turn, and as authority for his statement, Cooley relies upon this quotation from Locke on Civil Government:

"Fourthly. The legislative neither must nor can transfer the power of making laws to anybody else, or place it anywhere but where the people have."

We suppose that all people who live in a democracy and enjoy its fruits must hold in high regard all pronouncements of John Locke, his contemporaries and those who followed him: Whose ideas in turn led to the American and the French Revolutions, and the practical application of his novel conception that "all power is inherent in the people and all free government founded on authority." But we must also remember that Locke's works on social and governmental policies were written at a time when the principles of democracy had begun their tremendous struggle with that of the divine right of kings. We must remember too that Locke himself believed that all matters pertaining to the divine or the secular should be examined carefully and that no "innate principle" should be accepted or continued in practice merely because it was venerable.

"He believed that in attacking 'innate principles' he was pleading for universal reasonableness instead of blind reliance on authority and was thus, as he says, not 'pulling up the foundations of knowledge,' but 'laying those foundations surer.' When men heard that there were propositions that could not be doubted, it was a short

and easy way to assume that what are only arbitrary prejudices are 'innate' certainties." (Encyclopedia Britannica.)

But above all, Locke believed that all human ideas, even the most complex and abstract, ultimately depended upon "experience" to dedicate their truth. It has been said of him that his "Essay Concerning Human Understanding" (1690) "represents the first major modern presentation of the empirical theory of knowledge. In developing an account of human knowledge in terms of how it is derived from experience, what its nature is, and how limited it is, Locke provided the basic pattern of future empirical philosophy."

■ So, if Locke was the fountainhead of the thesis that power could not be delegated, we feel sure that the experience of the last several centuries would have caused him to repudiate this idea. Experience has demonstrated some of the power must be invested in other bodies so that the government may function in a world that progressively is becoming more complex. There is nothing wrong with this so long as the delegating authority retains the right to revoke the power. The wrong (and the hypocrisy) lies in affirming the truth of the catch phrase while at the same time denying its existence by a devolution of the power. The plain realities of recent cases show that rarely enactments involving this question are held defective.

In 1 Am.Jur.2nd 898, it is said:

"The rule precluding the delegation of power by the legislature does not embrace every power the legislature may properly exercise. Any power not legislative in character which the legislature may exercise it may delegate. What the rule precludes is the delegation of those powers which are strictly or inherently and exclusively legislative and the legislature's abdication of its own power and the conferring of such power upon an administrative agency to be exercised in its uncontrolled discretion.

"The Constitution does not demand the impossible or the impracticable and has never been regarded as denying to the legislature the necessary resources of flexibility and practicality to perform its function. In fact, the Supreme Court has held that a constitutional power implies a power of delegation of authority under it sufficient to effect its purposes. The delegation to administrative agencies of some legislative power is necessary particularly in modern regulatory enactments in which the legislature is incapable of defining the multitudinous details. Such delegation is not precluded by the basic concept of a 'government of laws, and not of men.' There is no doubt that the legislature may delegate to an administrative agency the exercise of a limited portion of its legislative power with respect to some specific subject matter."

In Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892) it was said:

"That congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution."

As late as 1932 in United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 85, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932) it was said:

"That the legislative power of Congress cannot be delegated is, of course, clear."

Still Davis in his work "Administrative Law Treatise" is able to make this statement:

"In only two cases (Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) A. L. A. Schechter Poultry Corp. vs. United

States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947 (1935)) in all American history have congressional delegations to public authorities been held invalid. Neither delegation was to a regularly constituted administrative agency which followed an established procedure designed to afford the customary safeguards to affected parties. The Panama case was influenced by exceptional executive disorganization and in absence of such a special factor would not be followed today. The Schechter case involved excessive delegation of the kind that Congress is not likely again to make. The fact is that Congress avoided such delegation through the entire period of the Second World War."

The pressures and the practicabilities of administration of modern government have led the courts to the continuous affirmation of the existence of this judge-made rule while at the same time denying its existence by the holding or decision in nearly all cases. This has sometimes been done by holding where "standards" are set up—however vague or general they may be—that legislative power has not been delegated because only details of the policy were devolved. We will not, however, examine that pretense here.

We have decided we will meet this problem with full recognition that legislative power often has been delegated, with full court approval, and it is not necessary to disguise such action in form of expression or words which have no verity.

■ In the case under consideration the specific issue is presented by KRS 341.145 (3) (a) which reads in part:

"Any provisions of this chapter to the contrary notwithstanding, the commissioner is hereby authorized to enter into reciprocal arrangements with duly authorized agencies of other states or of the Federal Government, or both, whereby workers with potential rights to benefits in this and another state or other states or the Federal Government may have such rights determined upon the basis of his combined potential rights in such jurisdictions. Benefits, based upon such combined potential rights, may be paid either under provisions of this chapter or under the provisions of the law of another state or the Federal Government, or under such combination of provisions of both laws as may be agreed upon as being fair and reasonable to all affected interests. No such an arrangement shall be entered into unless each agency entering into such arrangement shall agree to reimburse the fund of the other agency to the extent of the liability incurred under terms of the arrangement."

By passing that act the General Assembly has expressed its opinion about the necessity and desirability of investing in another the power to carry out the terms of the policy embodied in the enactment. The ephemeral qualities of each session of the legislature are such the desirable and beneficial purpose of the act could not be fulfilled if complete detailed laws were required for each case presented. By delegation it will accomplish the goal desired which otherwise could not be attained. The fact that the laws of other states may change is additional reason why the commissioner should be granted flexible power.

We find the acceptance of the laws of other states or of the federal government to be a sufficient and effective safeguard to the exercise of power by the commissioner—so much more than if the commissioner were handed that power without limitation. Since the General Assembly has seen fit to accept the judgment of other legislative bodies as to scales of base period, qualifying wages, et cetera, now and in the future, and adopted them as their own in these special cases, we see no reason it should be denied this right.

It will be noted that under § 28 of the Constitution, above quoted, no branch of

**590**

the government shall exercise power properly belonging to another. This case demands judicial self-restraint and the accord of high respect to a policy determination which has been made by the General Assembly.

We believe the act to be constitutional in all aspects and the judgment is therefore reversed.

MONTGOMERY, J., dissenting.